**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181
*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and Class Members*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SAIDUR RAHMAN, *on behalf of himself,*
*FLSA Collective Plaintiffs, and the Class,*

Plaintiff,

v.

DUCASSE HOLDING CORP.
d/b/a THE DUCASSE PARIS GROUP,
BB AT 55TH & 5TH, LLC
d/b/a BENOIT, and
ALAIN DUCASSE,

Defendants.

---

Case No:

**CLASS AND COLLECTIVE ACTION COMPLAINT**

Plaintiff, SAIDUR RAHMAN (“Plaintiff”), on behalf of himself and others similarly situated, by and through his undersigned attorneys, hereby files this Class and Collective Action Complaint against Defendants, DUCASSE HOLDING CORP., BB AT 55TH & 5TH, LLC, (together the “Corporate Defendants”), and ALAIN DUCASSE (the “Individual Defendant”) (all three defending parties, the “Defendants”) and states as follows:

## INTRODUCTION

1. Plaintiff alleges, pursuant to the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 *et. seq.* ("FLSA"), that he and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages due to policies of time-shaving, (2) unpaid wages due to invalid tip credit deductions, (3) unpaid tips due to tip misappropriation, (4) liquidated damages for unpaid wages, overtime, and tips, and (5) attorneys' fees and costs.

2. Plaintiff additionally alleges, pursuant to the New York Labor Law ("NYLL"), that he and similarly situated individuals are entitled to recover from Defendants: (1) unpaid wages due to policies of time-shaving, (2) unpaid wages due to invalid tip credit deductions, (3) unpaid tips due to tip misappropriation, (4) unpaid call-in pay premiums, (5) liquidated damages for unpaid wages, overtime, tips, and premiums, (6) statutory penalties due to WTPA violations, and (7) attorneys' fees and costs.

3. Plaintiff individually alleges that, pursuant to the New York State Human Rights Law, New York Executive Law § 296 ("NYSHRL"), Plaintiff was deprived of his statutory rights due to Defendants' discrimination based on Plaintiff's (i) race, (ii) color, and (iii) national origin, and seeks to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, (4) damages for emotional distress, and (5) attorneys' fees and costs.

4. Plaintiff additionally individually alleges that, pursuant to the New York City Human Rights Law, Administrative Code of the City of New York § 8-107 ("NYCHRL"), Plaintiff was deprived of his statutory rights due to Defendants' discrimination based on Plaintiff's (i) race, (ii) color, and (iii) national origin, and seeks to recover (1) economic damages, (2) compensatory damages, (3) punitive damages, (4) damages for emotional distress, and (5) attorneys' fees and costs.

5. Plaintiff further individually claims that Defendants unlawfully retaliated against him through (i) schedule reduction and (ii) termination due to (a) Plaintiff's complaints regarding Defendants' wage and hour violations, and (b) discriminatory reasons, in violation of the FLSA, the NYLL, the NYSHRL, and the NYCHRL, and seeks to recover from Defendants: (1) economic damages, (2) compensatory damages, (3) punitive damages, (4) damages for emotional distress, and (5) attorneys' fees and costs.

**JURISDICTION AND VENUE**

6. This Court has jurisdiction over this controversy pursuant to 29 U.S.C. §216(b), 28 U.S.C. §§1331, 1337 and 1343, and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

7. Venue is proper in the Southern District pursuant to 28 U.S.C. §1391.

**PARTIES**

8. Plaintiff, for all relevant time periods, was a resident of Kings County, New York.

9. Defendants collectively own and operate a restaurant under the trade name "Benoit" (a/k/a Benoit Bistro or Benoit New York) located at 60 West 55th Street, New York, NY 10019.

10. Corporate Defendant BB AT 55TH & 5TH, LLC is a domestic business corporation that operates Benoit.

11. Corporate Defendant DUCASSE HOLDING CORP. is a domestic business corporation and the American subsidiary of De Gustibus SAS d/b/a "Ducasse Paris Group" (f/k/a Alain Ducasse Entreprise) which is a France-based restaurant group with 27 restaurants worldwide.[1][2] DUCASSE HOLDING CORP. is a direct or indirect parent company to BB AT 55TH & 5TH, LLC.

---

[1] https://www.ducasse-paris.com/en/the-group/
[2] https://www.ducasse-paris.com/en/addresses/?categorie=restaurant

12. Individual Defendant ALAIN DUCASSE is the President and Founder of the Ducasse Paris Group[3], the Chief Executive Officer of Corporate Defendant DUCASSE HOLDING CORP. (*see* **Exhibit A**), and a Principal, Managing Member, and Owner of Corporate Defendant BB AT 55TH & 5TH, LLC (*see* **Exhibit B**).

13. At all relevant times, the Individual Defendant exercised direct and actual functional control and oversight of the business and financial operations, as well as all other general affairs, of Benoit and its operating entities and its operating entities' parent companies (including both Corporate Defendants).

14. At all relevant times, the Individual Defendant exercised direct and actual control over the employment terms and conditions and the compensation structures of all employees of Benoit, including Plaintiff, FLSA Collective Plaintiffs, and Class Members.

15. At all relevant times, the Individual Defendant held and exercised direct and actual authority, control, and oversight over all Managers and Supervisors of Benoit's employees, including Plaintiff, FLSA Collective Plaintiffs, and Class Members.

16. At all relevant times, the Individual Defendant exercised the direct and actual power and authority (and also delegated the power and authority to managers and supervisors) to: (i) hire and fire all employees and Managers of Benoit (including Plaintiff, FLSA Collective Plaintiffs, and Class Members), (ii) determine their hourly rates or salaries, frequencies of payments, and means of payments, (iii) establish, alter, or otherwise affect their work schedules, (iv) otherwise directly or indirectly affect the qualities, terms and conditions of their employments, and (v) maintain their employment records.

17. Throughout the relevant period, the Individual Defendant directly ensured that Benoit operated efficiently and profitably by visiting Benoit to: (i) inspect the operations and

[3] https://www.ducasse-paris.com/en/the-group/

quality of food, service, and hygiene of Benoit, (ii) meet and confer with Benoit's management team to discuss operations, sales, and overall status of the restaurant and its employees, (iii) pick up or drop off supplies, ingredients, or paperwork, (iv) personally supervise employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) and managers and monitor their individual performances of duties and behaviors to ensure they effectively completed their job duties, (v) directly or indirectly reprimand any employees (including Plaintiff, FLSA Collective Plaintiffs, and Class Members) or managers who did not perform their duties sufficiently or correctly, or displayed inappropriate behavior.

18. Throughout the relevant period, Plaintiff, FLSA Collective Plaintiffs, and Class Members would be made aware that the Individual Defendant was the owner of Benoit. At all relevant times, Plaintiff, FLSA Collective Plaintiffs, and Class Members had the ability to, and/or actually did, complain to the Individual Defendant (via direct contact during his visits to Benoit or by digital communications) directly regarding any of the terms of their employments, and the Individual Defendant would have the actual power and authority to immediately, directly, and actually affect any changes to the qualities and terms of their employments to appease their complaints (including, but not limited to, immediately changing their schedules, compensation, locations, or positions).

19. At all relevant times, the Individual Defendant's roles, and the decisions made in connection to his roles, directly and actually affected the nature, conditions, and circumstances of Plaintiff's, FLSA Collective Plaintiffs', and Class Members' employments.

20. The Individual Defendant is registered as a Principal and Managing Member of Benoit with The New York State Liquor Authority (*see* **Exhibit B**). Pursuant to the New York State Liquor Authority Handbook for Retail Liquor Licensees, New York State liquor license

holders must (1) prevent sales of liquor to minors, (2) prevent disorder, (3) confine service and consumption of liquor to the licensed area, (4) prevent sales of liquor to visibly intoxicated persons, (5) prohibit their businesses from offering unlimited drink specials, (6) ensure licensed restaurants have suitable kitchen facilities to prepare and serve a full menu whenever their business is open, (7) prevent individuals from appearing nude or partially nude on the licensed premises, (8) prevent the premixing of liquor, (9) prevent the refilling of liquor, (10) prevent possession of untaxed cigarettes & tobacco products, (11) prevent contamination of bottles, (12) maintain adequate books and records of all transactions involving the licensed business, (13) ensure proper identification of all beer taps, (14) ensure compliance with all stipulations and conditions of the liquor license agreement, (15) comply with all state and local laws and regulations governing the operations of the licensed business. *See* the New York State Liquor Authority Handbook for Retail Liquor Licensees, as amended July 31, 2025, pgs. 17-21.[4] Because the Individual Defendant is the liquor licensee for Benoit, the Individual Defendant is required by New York State law to personally ensure Benoit's operations comply with the above 15 requirements. Specifically:

> "You as the licensee are responsible for the activities of employees and patrons in all parts of the licensed premises (even if you are not always physically present) to ensure that the business is operating in accordance with the ABCL. The following are common issues faced by retailers that could subject you to disciplinary action if you do not meet your responsibilities as a licensee." *Id.*, pg. 17. [4]

21. Therefore, in order for the Individual Defendant to comply with his legal responsibilities as the license holder of Benoit, he is required to visit the premises of Benoit and conduct regular internal auditing of the operations of Benoit.

22. As the liquor licensee for Benoit, the Individual Defendant is required by New

[4] https://sla.ny.gov/system/files/documents/2025/08/stateliquorauthority-retaillicenseeshandbookrevised7-31-2025.pdf

York State law to personally impose a very specific degree of management and control of Benoit's operations and employee performance and to also comply with all state and local laws which govern Benoit's business operations, including (i) the New York Labor Law, (ii) the New York Codes, Rules and Regulations, (iii) the New York City Administrative Code, (iv) the New York State Human Rights Law, and (v) the New York City Human Rights Law, among others. Failure to do so would be in violation of Defendants' liquor license agreement and the provisions of the New York State Alcoholic Beverage Control Law, which could result in disciplinary action by the New York State Liquor Authority, including (i) arrest, (ii) fines of up to $10,000 per violation, or (iii) the suspension, cancellation, or revocation of the liquor license. *See id.*; *see also* the New York Alcoholic Beverage Control Law, Chapter 478 of the Laws of 1934.

23. At all relevant times, the Individual Defendant complied with the New York State Alcoholic Beverage Control Law and the provisions of his liquor license agreement with the New York State Liquor Authority (except for his requirement to comply with all other state and local laws) by personally appropriately managing and controlling the operations of Benoit, sufficiently supervising its employees, and maintaining all necessary books and records.

24. At all relevant times, each of the Corporate Defendants was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA and the NYLL.

25. At all relevant times, the work performed by Plaintiff, FLSA Collective Plaintiffs and Class Members was directly essential to the business operated by Defendants.

**FLSA COLLECTIVE ACTION ALLEGATIONS**

26. Plaintiff brings claims for relief as a collective action pursuant to FLSA Section 16(b), 29 U.S.C. § 216(b), on behalf of all non-exempt employees, including Servers, Bussers, Bartenders, Food Runners, Hostesses, Delivery Persons, Line Cooks, Food Preparers, and

Dishwashers, among others, employed by Defendants on or after the date that is six years before the filing of the Complaint in this case as defined herein (herein, "FLSA Collective Plaintiffs").

27. At all relevant times, Plaintiff and the other FLSA Collective Plaintiffs are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in a willful failure and refusal to pay Plaintiff and FLSA Collective Plaintiffs their proper wages, including their overtime premiums at one and a half times their regular rates for all hours worked over forty (40) in a workweek, due to Defendants' policy of time-shaving.

28. The claims of Plaintiff stated herein are essentially the same as those of the other FLSA Collective Plaintiffs. Plaintiff and a subclass of tipped employees within the FLSA Collective Plaintiffs were additionally subjected to Defendants' (i) failure to pay their proper wages, including overtime premiums, due to Defendants' policy of deducting invalid tip credits from their wages for all their hours worked, and (ii) failure to pay all owed tips due to tip misappropriation.

29. The claims for relief are properly brought under and maintained as an opt-in collective action pursuant to § 16(b) of the FLSA, 29 U.S.C. 216(b). The FLSA Collective Plaintiffs are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided to FLSA Collective Plaintiffs via first class mail to the last address known to Defendants.

**RULE 23 CLASS ALLEGATIONS**

30. Plaintiff brings claims for relief pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23, on behalf of all non-exempt employees, including Servers, Bussers,

Bartenders, Food Runners, Hostesses, Delivery Persons, Line Cooks, Food Preparers, and Dishwashers, among others employed by Defendants on or after the date that is six years before the filing of the Complaint in this case as defined herein (the "Class" or "Class Members").

31. The Class Members are readily ascertainable. The number and identity of the Class Members are determinable from the records of Defendants. The hours assigned and worked, the position held, and rates of pay for each Class member may also be determinable from Defendants' records. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. Notice can be provided by means permissible under F.R.C.P. 23. The Class also includes a subclass of non-exempt tipped employees, including Servers, Bartenders, Bussers, and Food Runners, among others, employed by Defendants (the "Subclass" or "Subclass Members"). Plaintiff is a member of both the Class and the Subclass.

32. The proposed Class is so numerous such that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the Court. Although the precise number of such persons is unknown because the facts on which the calculation of that number rests presently within the sole control of Defendants, there is no doubt that there are more than forty (40) members of the Class. Further, there is no doubt that there are more than forty (40) members of the Subclass.

33. Plaintiff's claims are typical of those claims that could be alleged by any member of the Class, and the relief sought is typical of the relief, that would be sought by each member of the Class in separate actions. All the Class Members were subjected to the same corporate practices by Defendants, as alleged herein, of Defendants': (1) failure to pay wages and overtime due to time-shaving (2) failure to pay call-in pay premiums; (3) failure to provide proper wage

and hour notices, at dates of hiring and annually thereafter, per requirements of the New York Labor Law, and (4) failure to provide proper wage and hour statements, per requirements of the New York Labor Law. Defendants' corporate-wide policies and practices affected all Class Members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class Member. Plaintiff and Class Members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices and procedures of Defendants.

34. Additionally, Plaintiff's claims are typical of those claims that could be alleged by any member of the Subclass. In addition to the above, Plaintiff and all Subclass Members were also subject to the same corporate practices of Defendants' (i) failure to pay minimum wages and overtime wages due to a policy of deducting invalid tip credits from their wages, and (ii) failure to pay all owed tips due to tip misappropriation.

35. Plaintiff and the Subclass suffered from Defendants' failure to pay minimum wages due to Defendants' invalid tip credit policy because Defendants: (i) failed to properly provide Plaintiff and Subclass Members with tip credit notices as required by NYLL § 195 at their dates of hiring and annually thereafter, (ii) deducted tip credits from Plaintiff's and Subclass Members' wages for all hours worked despite having caused them to engage in non-tipped duties for continuous periods of time exceeding thirty (30) minutes every shift, (iii) deducted tip credits from Plaintiff's and Subclass Members' wages for weeks where the total amount of non-tip producing work or side work they each performed exceeded 20% or 2 hours of the total work they performed for that week, and (iv) subjected Plaintiff and Subclass Members to an invalid tip pool.

36. Plaintiff is able to fairly and adequately protect the interests of the Class and Subclass and has no interests antagonistic to the Class or Subclass. Plaintiff is represented by

attorneys who are experienced and competent in both class action litigation and employment litigation and have previously represented plaintiffs in wage and hour cases.

37. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of the wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because losses, injuries and damages suffered by each of the individual Class members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

38. Defendants and other employers throughout the state violate the New York Labor

Law. Current employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the Complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

39. There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including:

a) Whether Defendants employed Plaintiff and Class Members within the meaning of the New York Labor Law;

b) What are and were the policies, practices, programs, procedures, protocols, and plans of Defendants regarding the types of work and labor for which Defendants did not pay Plaintiff and Class Members properly;

c) At what common rate, or rates subject to common methods of calculation, was and are Defendants required to pay Plaintiff and Class Members for their work;

d) Whether Defendants properly notified Plaintiff and the Class Members of their hourly rates and overtime rates;

e) Whether Defendants properly paid Plaintiff and Class Members for all their actual hours worked;

f) Whether Defendants properly provided notice to Plaintiff and Subclass Members that Defendants were deducting tip credits from their wages;

g) Whether Defendants provided proper wage statements informing Plaintiff and Subclass Members of the amount of tip credits deducted from their wages for

each payment period, their proper overtime rates of compensation, and other information Defendants were required to provide to them on their wage statements, as provided under the New York Labor Law;

h) Whether Defendants deducted the proper amounts of tip credit allowance from Plaintiff's and Subclass Members' wages under the New York Labor Law;

i) Whether Defendants required Plaintiff and Subclass Members to perform non-tipped work for more than 20% of their workdays;

j) Whether Defendants required Plaintiff and Subclass Members to perform non-tipped work for continuous periods of time exceeding 30 minutes;

k) Whether Defendants paid Plaintiff and Subclass Members the full amount of their properly owed tips;

l) Whether Defendants subjected Plaintiff and Subclass Members to a proper tip pooling arrangement;

m) Whether Defendants paid Plaintiff and Class Members their owed call-in pay premiums;

n) Whether Defendants provided Plaintiff and Class Members with proper wage and hour notices, at their dates of hiring and annually, per requirements of the New York Labor Law;

o) Whether Defendants provided Plaintiff and Class Members with proper wage statements with each payment of wages, as required by New York Labor Law;

p) Whether Defendants paid Plaintiff and Class Members the prevailing New York State minimum wage for all their hours worked; and

q) Whether Defendants properly compensated overtime premiums to Plaintiff

and Class Members for their overtime hours worked under New York State law.

## STATEMENT OF FACTS

**Plaintiff's Employment Details**

40. In or around April 2008, Plaintiff was hired by Defendants to work as a Busser at Defendants' Benoit restaurant. Plaintiff's employment with Defendants ended in or around December 2024.

41. Throughout his employment, Plaintiff was scheduled by Defendants to work five (5) days per week, from 4:00 PM to between 11:30 PM - 12:00 AM, for a total of approximately thirty-five (35) to forty (40) hours per week. Throughout the relevant period, FLSA Collective Members and Class Members worked similar amounts of days and hours each week.

42. Throughout his employment, Plaintiff was always paid by Defendants at the prevailing New York State minimum tipped credit hourly payrates. At all relevant times, Defendants paid tipped FLSA Collective Plaintiffs and Subclass Members at similar hourly rates. Additionally, Defendants similarly sometimes compensated FLSA Collective Plaintiffs' and Class Members' overtime hours at their regular hourly rates.

**Plaintiff's Timeshaving Claims**

43. At all relevant times, Defendants failed to compensate Plaintiff, FLSA Collective Plaintiffs, and Class Members for all hours they were required by Defendants to work due to policies of timeshaving, in violation of the FLSA and the NYLL.

*(a) Meal Break Timeshaving*

44. Throughout Plaintiff's employment, Defendants never provided Plaintiff with any free and clear meal breaks, and required Plaintiff to work all hours of his shifts. However,

Defendants automatically deducted 30 minutes from Plaintiff's wages every workday as if Plaintiff had actually taken a meal break, in order to make it seem as if they were providing Plaintiff with his lawfully-required meal breaks. As a result, Plaintiff was not paid for 30 minutes of work every workday.

45. Defendants similarly did not provide FLSA Collective Plaintiffs and Class Members with free and clear meal breaks, and automatically deducted 30 minutes from their wages each workday.

46. At all relevant times, Defendants knowingly and willfully operated their business with a policy of timeshaving Plaintiff's, FLSA Collective Plaintiffs', and Class Members' hours worked outside of their scheduled hours, in violation of the FLSA and the NYLL.

*(b) <u>Timeshaving as a result of Time-Clock System Failure</u>*

47. At all relevant times, Defendants utilized a time-clock system to record employees clock-in and clock-out times. Plaintiff was required to clock in and out using this system every workday.

48. Throughout Plaintiff's employment, Defendants' time-clock system would malfunction some days, and employees would not be able to clock in or out on these workdays. When this happened, Defendants did not utilize any backup methods to manually record employees' clock-in and clock-out times, and Defendants would then intentionally fail to pay employees any wages for these workdays.

49. As a result, Plaintiff was not paid any wages for all workdays where Defendants' time-clock system malfunctioned.

50. Similarly, FLSA Collective Plaintiffs and Class Members were not paid any wages for all their workdays where Defendants' time-clock system malfunctioned.

51. At all relevant times, Defendants knowingly and willfully operated their business with a policy of failing to pay wages to Plaintiff, FLSA Collective Plaintiffs, and Class Members all their hours worked due to timeshaving, in violation of the FLSA and the NYLL.

**Plaintiff's Unpaid Call-In Pay Premiums Claims**

52. At all relevant times, Defendants failed to pay call-in pay premiums to Plaintiff and Class Members for all their instances of reporting to work for a scheduled shift which lasted less than three (3) hours, in violation of the NYLL.

53. Throughout his employment, Plaintiff was regularly sent home by Defendants after reporting to work for a scheduled shift and working between 0.00 to 2.99 hours. The frequency changed depending on the volume of Defendants' business, with the highest frequency being three times per week during the summer seasons every year. Class Members were similarly regularly sent home early after reporting to work for scheduled shifts.

54. However, Defendants failed to pay Plaintiff and Class Members their owed call-in pay premiums for every workday lasting less than three (3) hours.

55. At all relevant times, Defendants knowingly and willfully operated their business with a policy of failing to pay call-in pay premiums to Plaintiff and Class Members for each of their workdays lasting ten or more hours, in violation of the NYLL.

**Plaintiff's Invalid Tip Credit Deductions Claims**

56. At all relevant times, Defendants failed to adequately compensate Plaintiff, FLSA Collective Plaintiffs, and Class Members for all hours they were required to work by Defendants, due to Defendants' policy of deducting invalid tip credits from their wages, in violation of the FLSA and the NYLL.

57. Throughout Plaintiff's employment, Defendants deducted the maximum tip credit

allowance permitted by the NYLL each year from Plaintiff's, Tipped FLSA Collective Plaintiffs', and Subclass Members' wages.

58. However, Defendants were not actually entitled to deduct any tip credits from Plaintiff's, Tipped FLSA Collective Plaintiffs', Subclass Members' wages under the FLSA or the NYLL because Defendants: (i) failed to provide tip credit notice to Plaintiff, FLSA Collective Plaintiff and Subclass Members at their hirings, (ii) deducted tip credits from Plaintiff's, FLSA Collective Plaintiffs' and Subclass Members' wages for all hours worked despite having caused them to engage in non-tipped duties for (a) continuous periods of time exceeding thirty (30) minutes, and (b) more than 20% of the work they performed each week, and (iii) subjected Plaintiff, FLSA Collective Plaintiffs, and Subclass Members to an invalid tip pool and misappropriated their tips.

59. As a direct result of Defendants' invalid tip credit deduction policy, Plaintiff and Subclass Members were paid below the New York State minimum wage in violation of the NYLL. *See* 12 N.Y.C.R.R. § 146-1.2, *et seq.*

60. Throughout Plaintiff's employment, Defendants required Plaintiff to engage in numerous non-tipped duties such as (i) general cleaning of the restaurant and bathrooms, (ii) sweeping and mopping the floors, (iii) accepting, transferring, and unloading food and wine deliveries, and (iv) preparing silverware roll-ups, among others.

61. Throughout his employment, Plaintiff spent continuous periods of over thirty (30) minutes engaging in non-tipped closing duties at the end of every workday. Throughout the relevant period, Benoit's hours of service ended between 9:00 PM and 9:30 PM, depending on the day of the week.[5] However, Plaintiff was required by Defendants to work until between 11:30 PM and Midnight each day, performing non-tipped closing duties, resulting in 2.50 to 3.00

[5] https://www.benoitny.com/

hours of consecutive non-tipped work at the end of every workday. Additionally, Plaintiff spent another 2.00 non-consecutive hours throughout every shift doing additional non-tipped side work. In total, Plaintiff spent approximately 4.50 to 5.00 hours performing non-tipped duties each workday. Because Plaintiff's shifts were 7.50 to 8.00 hours long, Plaintiff's 4.50 – 5.00 hours of daily non-tipped side work always took up more than 20% of Plaintiff's hours worked. Such excessive non-tipped side work is beyond sufficient to invalidate Defendants' tip credit deductions from Plaintiff's wages.

62. Additionally, Defendants were not entitled to deduct tip credits from tipped FLSA Collective Plaintiffs' and Subclass Members' wages, as they required these employees to engage in similar non-tipped duties for similar amounts of time.

63. Further, Plaintiff and Subclass Members never received any notices from Defendants that Defendants were claiming a tip credit on their weekly compensation. They were never told by Defendants that Defendants were deducting tip credits from their wages nor did they ever receive proper notice by Defendants as to the amount of tip credit allowances Defendants deducted for each payment period during their employments.

**<u>Plaintiff's Unpaid Tips due to Misappropriation of Tips to Non-Eligible Employees Claim</u>**

64. At all relevant times, Defendants failed to properly appropriate Plaintiff's, tipped FLSA Collective Plaintiffs', and Subclass Members' tips due to Defendants' policy of subjecting them to an invalid tip pool which included non-eligible employees, in violation of the FLSA and the NYLL.

65. At all relevant times, every front-of-house employee (including Servers, Bussers, Bartenders, Food Runners, Sommeliers, and Hosts/Hostesses) who worked at Benoit were automatically subjected to a mandatory tip pool by Defendants, regardless of whether an

employee (i) directly engaged in sufficient customer interaction and table attendance, (ii) maintained a prominent presence in Benoit's dining areas, (iii) customarily and regularly received tips for the work they engaged in, and/or (iv) was assigned or performed any tip-producing duties.

66. In New York, employers are required to assess an employee's eligibility for participation in a tip pool based on their "duties" and not just due to their "titles" (*see* 12 N.Y.C.R.R. § 146-2.14(e)).

67. Additionally, under the FLSA, employers who both (i) deduct a tip credit from employees pursuant to the FLSA and (ii) require these employees to contribute their tips to a tip pool must limit their tip pool to "employees who customarily and regularly receive tips" (*see* 29 CFR § 531.54). Employees are considered to customarily and regularly receive tips when they earn "more than $30 a month" in tips (*see* 29 CFR § 531.56(a)). Courts have found that employees are not considered to customarily and regularly receive more than $30 a month in tips if they are only able to do so through their inclusion in a mandatory tip pool. *See Chin v. Max One Retail LLC*, 657 F. Supp. 3d 639, 645 (D.N.J. 2023) (finding Hosts/Hostesses who worked for the Friendly's restaurant chain failed to "meet the definition of 'tipped employees' because none were 'engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips' absent their inclusion in the tip pool" (quoting 29 U.S.C. § 203(t))).

68. Further, the United States Department of Labor's Wage and Hour Division assesses a restaurant employee's eligibility to participate in a tip pool pursuant to the FLSA based on their services provided to, and the degree of their interaction and engagement with, the restaurant's customers. Such services and interactions within their evaluation include, (i) "sharing and detailing […] offerings", (ii) making suggestions regarding […] offerings", (iii)

"fielding questions about the different options", (iv) "provid[ing] expertise", and (v) whether the employee remains in "plain view of the restaurant's customers" (*see* WHD Opinion Letter FLSA2025-03 (September 30, 2025)).

69. At all relevant times, Defendants' Hosts/Hostesses were not eligible to participate in Defendants' tip pools, because these employees (i) engaged in minimal customer interaction, (ii) provided minimal table attendance, (iii) were not prominently present in, and were not in plain sight of, most of Benoit's dining areas, (iv) were solely included in the tip pool by Defendants due to their title and not their duties or performance, and (v) did not customarily and regularly earn tips.

70. Specifically, Defendants' Hosts/Hostesses:

(a) Merely greeted and sat customers and provided them with menus;

(b) Did not attend to tables outside of seating customers or providing them menus;

(c) Did not prepare or bring customers waters or any food and drink orders;

(d) Did not clean, bus, or set tables;

(e) Did not take orders or initiate any sales through Defendants' point of sales systems;

(f) Lacked knowledge and expertise regarding Benoit's foods, cocktails, wines, and specials;

(g) Did not share, detail, suggest, or answer questions regarding Benoit's foods, cocktails, wines, and specials due to their lack of expertise, and would defer such services and questions to Defendants' Servers, Bartenders, Sommeliers, and Managers;

(h) Spent most of their shifts manning the host stand, which is not in plain view of most of Benoit's dining areas and customers, in order to wait for any prospective customers to come to the restaurant. *See* **Exhibit C**.[6] Benoit's main dining room has approximately 35 tables (with space for up to approximately 100 people) (***id.*, pgs. 1-2**), most of which the host stand is not visible from, nor would any customers sat here be able to grab the attention of the Hosts/Hostesses most of the time due to the host stand facing away from this room (***id.*, pgs. 2-3**). Additionally, Benoit has multiple private dining rooms in the back of the restaurant, at which the host stand is also not visible (***id.*, pgs. 4-6**). Accordingly, Defendants' Hosts/Hostesses were usually not in plain view of approximately 90% of Benoit's dining space. Further, the only dining area where the host stand is visible is the bar room (***id.***, **pg. 7**), however, customers seated here would already have numerous Bartenders, Bussers, and Servers to service and assist them and would hardly, if ever, request assistance from the Hosts/Hostesses;

(i) Did not customarily and regularly receive more than $30 per month in tips outside of the tip pool, similarly to the Hosts/Hostesses in *Chin*;

(j) Were improperly included in the tip pool by Defendants due to their title and not due to any duties they were individually assigned or performed, and would likely not have received any tips from Defendants' directly-tipped employees, such as Servers and Bartenders, had they not been included by Defendants, due to their minimal assistance to them; and

(k) Were likely not the intended recipients of any tips customers added to their

[6] https://maps.app.goo.gl/STR56qjZEQjcF91MA

bills or left on tables (including cash and credit) as they had minimal contact with customers and were typically out of sight to most customers.

71. Due to the foregoing, Defendants' Hosts/Hostesses were clearly ineligible to be included in Defendants' tip pool or receive any tips from it.

72. As a direct and proximate result of Defendants' utilizing an improper tip pool and misappropriating tips to Hosts/Hostesses, Plaintiff's, tipped FLSA Collective Plaintiffs', and Subclass Members' tip earnings were significantly reduced.

73. At all relevant times, Defendants knowingly and willfully operated their business with a policy of failing to pay Plaintiff, tipped FLSA Collective Plaintiffs and Subclass Members the full amount of their properly owed tips due to tip misappropriation, in violation of the FLSA and the NYLL.

**Plaintiff's WTPA Violation Claims**

74. At all relevant times, Plaintiff and Class Members never received wage notices or accurate wage statements from Defendants, in violation of the NYLL.

75. In violation of the Wage Theft Protection Act ("WTPA")—incorporated into NYLL—Defendants knowingly and willfully operated their business with a policy of not providing wage notices to Plaintiff and Class Members at the beginning of their employment with Defendants.

76. Defendants' wage statements violated the WTPA / NYLL, because wage statements that do not reflect the actual number of hours worked by the employee do not satisfy the requirements of the WTPA. *See Shi Yong Li v. 6688 Corp.*, 2013 U.S. Dist. LEXIS 148020, at *6 (S.D.N.Y. Sept. 27, 2013) ("The wage statements provided failed to accurately indicate the amount of time actually worked by tipped employees") (emphasis added); *Copper v. Cavalry*

*Staffing, LLC*, 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015) (holding that "the 'number of overtime hours' that appears on the wage statement should include every hour actually 'worked' by the employee") (emphasis added); *Campos v. Bkuk 3 Corp.*, 2021 U.S. Dist. LEXIS 151528, at *30 (S.D.N.Y. Aug. 10, 2021) ("Thus, when paystubs were received, they were not accurate insofar as they did not accurately reflect the hours actually worked") (emphasis added). Here, Defendants' wage statements did not reflect the actual amount of hours Plaintiff and Class Members worked, and instead reflected the amount of hours Defendants paid them for after Defendants timeshaved hours of wages from them every pay period.

77. In failing to provide proper wage statements and notices, Defendants have failed to comply with the law in a manner that entails a concrete harm to an interest identified by the New York State legislature. As one Court observed:

> Here, Plaintiffs allege that Defendants failed to furnish them with proper wage notices and statements, as required by NYLL §§ 195(1) and 195(3). These provisions were enacted as part of New York's Wage Theft Prevention Act ("WTPA"), N.Y. Lab. Law § 195, which sought "to expand the rights of employees to seek civil and criminal avenues of remedy for their employers failing to follow labor law appropriately and the specifications therein." N.Y. Spons. Mem., 2010 S.B. 8380. More specifically, the New York State Assembly passed the WTPA to address studies showing that a large number of employees were not being paid the wages owed to them, and that many employers were not adequately informing their employees of their wages and how they are calculated in language the employees could understand. *Id.* The New York State Assembly opined that existing penalties did not adequately deter employers from paying less than the wages owed, and stated that the WTPA would dramatically change this by increasing penalties for violating employees' rights. *Id.*

*Imbarrato v. Banta Mgmt. Servs.*, 2020 U.S. Dist. LEXIS 49740, at *21-22 (S.D.N.Y. March 20, 2020)

78. Here, Defendants' failure goes beyond generating a risk of harm to Plaintiff and Class Members. Defendants' conduct actually harmed Plaintiff and Class Members. Defendants' failure to provide wage notices and paystubs listing all hours actually worked and rates of pay,

including overtime hours and overtime rates, deprived employees of the ability to contest the pay provided by Defendants, allowed Defendants to hide their wrong-doing, and necessitated the current litigation to vindicate Plaintiff's and Class Members' rights. This conduct ensured Defendants' ability to further delay providing proper compensation to low wage earners entitled to protection under federal and state law. Defendants' failure to provide wage notices and wage statements to employees allowed Defendants to hide their responsibility and deprive employees of timely compensation.

79. Had the wage statements Defendants provided to Plaintiff and Class Members accurately listed the total number of hours Plaintiff and Class Members actually worked, as required by law, Defendants would have had to either (a) increase the wages to correspond to the hours actually worked or (b) forthrightly acknowledge, by way of the wage statement, that the employee's wages did *not* correspond to the hours the employee actually worked. Either possibility would have allowed Plaintiff and Class Members to vindicate their rights under the NYLL. The deprivation of these possibilities therefore constitutes an injury.

80. The failure to provide proper wage notices and wage statements continues to result in delayed payment of all proper wages owed to Plaintiff and Class Members. This delayed payment caused Plaintiff and Class Members to struggle to pay bills and other debts.

81. Defendants knowingly and willfully operated their business with a policy of not providing proper wage notices and wage statements as required by NYLL.

82. The direct effect of understating the number of hours an employee worked is to reduce the wages that employees are listed as having earned on their wage statements. The direct effect of this, in turn, is to reduce the employee earnings that the employer later reports to the IRS through the employee's W-2 form, as such information is derived from the information on

employees' wage statements. *See Mills v. Mills,* 2021 Minn. Dist. LEXIS 200, at *5 (Minn. Dist. Ct., Anoka County, Tenth Judicial District May 20, 2021) ("Petitioner's gross annual income, based on her 2020 W-21 and paystub dated 12/24/20, is $130,321.30"); *T.F. v. N.F.*, 820 N.Y.S.2d 846, 846 (Sup. Ct., Suffolk Cty., June 22, 2006) ("In 2005 the plaintiff earned $ 133,086 as reflected on his final year paystub and W-2").[7]

83. The effect of reporting reduced wages on an employees' W-2 is, in turn, to reduce the amount of social security benefits available to the employee, as an employee's entitlement to benefits reflects how much money he or she is reported as having contributed to the social security system. *See McGauran v. Soc. Sec. Comm'n,* 2001 U.S. Dist. LEXIS 3187, at *7 (N.D. Cal. March 19, 2001) ("Social security benefits are based upon the worker's earnings as reported to the [SSA] . . . [and] the worker's earnings are used to determine insured status for entitlement to retirement and to calculate cash benefit rates." (quoting Social Security Administration, Handbook § 1400 (1997)); *Coward v. Zurich Am. Ins. Co*., 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) ("Under the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year.'") (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

84. "In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation." *Chen v.*

[7] It is true that the wages reported on W-2 forms are not always precisely identical to those listed on an employees' last paystub for the year. One reason for is, as the IRS explains, that "W-2 wages include: (i) the total amount of wages as defined in section 3401(a); (ii) the total amount of elective deferrals (within the meaning of section 402(g)(3)); (iii) the compensation deferred under section 457; and (iv) the amount of designated Roth contributions (as defined in section 402A)." https://www.irs.gov/pub/irs-drop/rp-19-11.pdf. However, the possibility, that wages listed on a W-2 might be affected by such considerations does not change the fact that the base wages on the W-2 are derived from paystubs. The paystub processing service *realcheckstubs* explains: "A pay stub contains crucial information that assists in calculating W2 wages. Paystub provides gross wages, deductions, taxes withheld, and other income-related data. Individuals gather the necessary figures required for accurate W2 calculation by referring to the pay stub." https://www.realcheckstubs.com/blog/paystubs/6-steps-how-to-calculate-w-2-wages-from-paystub.

*Lilis 200 W. 57th Corp.*, 2023 U.S. Dist. LEXIS 38163, at *18 (S.D.N.Y. Mar. 7, 2023). "On the other hand, 'allegations' that go 'beyond asserting a bare statutory violation and sufficiently allege concrete harm' resulting from 'the underpayment of wages' pass muster because 'monetary injury is a concrete harm sufficient for purposes of Article III standing.'" *Thompson v. Elev8 Ctr. N.Y., LLC*, 2023 U.S. Dist. LEXIS 122504, at *21 (S.D.N.Y. July 17, 2023) (quoting *Mateer v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 125017, at *4 (S.D.N.Y. July 14, 2022)).

85. Here, it is clear that Defendants' failure to provide Plaintiff and Class Members with accurate wage statements entailed "concrete, downstream consequences" involving monetary injury. Had the number of hours been accurately reported for a given pay period, Defendants' automatic payroll system would have correspondingly increased the wages due for that period, which in turn would have been reflected in the W-2s that Defendants submitted to the IRS on behalf of Plaintiff and Class Members. That, in turn, would have increased Plaintiff's and Class Members' entitlement to social security benefits. Because the inaccuracy prevented this outcome, it constitutes an injury sufficient to provide Plaintiff with Article III standing.

86. Courts agree that the misreporting of wages constitutes a concrete injury cognizable under Article III:

> The Seventh Circuit in *Calderon* squarely addressed FICA standing. The plaintiffs in *Calderon* were former employees alleging the employer failed to pay their FICA taxes. 999 F.2d at 1105-06. The Seventh Circuit found that the plaintiffs lacked standing to compel the employer to pay their FICA taxes because "[b]enefits do not. . . depend on whether the employer actually paid the taxes." *Id*. at 1106. Plaintiffs could, however, enforce FICA's reporting requirement because it is the reporting of income that triggers benefits, and losing benefits is an injury under *Lujan*. *Id*. Whether the employer in *Calderon* made FICA payments on the plaintiffs' behalf had no bearing on the plaintiffs' entitlement to benefits. *Id*. "[T]he plaintiff's real interest lies in ensuring that the [employer] make the proper reports of their income." *Id*.

*Coward*, 2011 U.S. Dist. LEXIS 74543, at *3-4.

87. The case at bar is somewhat different from *Coward* inasmuch as Defendants actually underpaid Plaintiff and other employees rather than merely misreporting their income. But this distinction has no bearing on the question of Article III standing, since it is still the case that "it is the reporting of income that triggers benefits, and losing benefits is an injury." *Id*. Plaintiff and Class Members lost benefits by virtue of how Defendants reported their income, and how Defendants reported employees' income was the direct outcome of the inaccuracies in employees' wage statements. That is why "Plaintiffs have standing to enforce the statutory reporting requirements" imposed by the WTPA. *Calderon v. Witvoet*, 999 F.2d 1101, 1106 (7th Cir. 1993).

88. Whether or not any Class Members are presently eligible for social security benefits is legally immaterial. *See id*. ("Although only citizens and aliens residing in the United States may receive benefits, 42 U.S.C. § 402(t), plaintiffs may eventually fulfill this requirement and therefore are entitled to keep their Social Security accounts accurate.").

89. The *Calderon* court stressed that an employee's interest in ensuring that an employer properly report the employee's income is amplified by the difficulty of persuading the government to correct errors:

> The practical difficulty is that eligibility for Social Security benefits presumptively depends on reports that employers send to the government. A worker who seeks credit for unreported income bears the burden of proof, 42 U.S.C. § 405(c)(3), (4), which will be hard to carry if the employer has not furnished the customary documentation. The government believes employers who report earnings, because these reports are costly to make--they entail paying a substantial tax. The government tends not to believe undocumented claims by employees, because these claims are essentially costless yet could establish entitlement to large pensions or disability benefits.
>
> All of this means that the plaintiffs' real interest lies in ensuring that the Witvoets make the proper reports of their income.

*Id.*

90. Here, the problem is not merely challenging but insurmountable. Plaintiff and Class Members cannot even attempt to have their earnings report corrected because Defendants *did* report what they actually paid Plaintiff and Class Members. The problem, rather, is that Plaintiff and Class Members were underpaid. Yet the ultimate effect is the same—reduced social security eligibility. Because "[u]nder the Social Security statute, entitlement depends on 'the total of the wages paid . . . to an individual in a calendar year,'" Plaintiff was irreversibly injured with respect to his social security benefits as soon as Defendants sent his W-2 to the IRS. *Coward*, 2011 U.S. Dist. LEXIS 74543, at *3 (N.D. Ill. July 8, 2011) (quoting 42 U.S.C. § 413(a)(2)(A)(ii)).

91. Defendants knowingly and willfully operated their business with a policy of failing to provide Plaintiff and Class Members with wage notices and accurate wage statements, in violation of the NYLL.

**Plaintiff's Discrimination Claims**

92. Throughout Plaintiff's employment, Defendants and agents of Defendants discriminated against Plaintiff on the basis of Plaintiff's race, color, and national origin, in violation of the NYSHRL and the NYCHRL.

93. Plaintiff is of Bengali descent and is dark-complexioned. Plaintiff's primary languages are English and Bengali.

94. Benoit is a French-themed restaurant owned by French-born ALAIN DUCASSE and his France-based company Ducasse-Paris Group. Throughout the relevant period, Benoit was managed and operated by a management team that consisted of predominantly light-complexioned French-born individuals, including, but not limited to:

(a) Defendant ALAIN DUCASSE (CEO, Owner, Founder);
(b) Julien Moreno (General Manager 2022–2025);
(c) Charles Pigeaux (Manager 2022–2023, Assistant General Manager 2023–2025, General Manager 2025–Present);
(d) Lucile Plaza (Chef de Cuisine 2020–Present);
(e) Joy Arfi (Marketing and Communications Manager 2024–2025);
(f) Jessie Jodet (Events Manager 2021–2022);
(g) Olivier Gresselin (Manager 2017–2020); and
(h) Laetitia Rouabah (Executive Chef 2016–2022).

*See* **Exhibit D**.

95. Additionally, Benoit's non-managerial senior service staff consists of predominantly light-complexioned French individuals, including, but not limited to:

(a) Romain Pochon (Head Sommelier 2022–Present);
(b) Julien Moreno (Head Sommelier 2019–2022);
(c) Jeremy Brochiero (Server Captain 2021–2023); and
(d) Thibault Brisabois (Head Server 2018–2019).

*See* **Exhibit D**.

96. Sometime at the beginning of Plaintiff's employment, Plaintiff informed Defendants and their management that he intended to become a Server and to work his way into earning a promotion to this position.

97. Plaintiff worked for Defendants for over 16 years. At least once per year throughout every year of Plaintiff's employment, Plaintiff requested to be promoted to a Server. However, all of Plaintiff's promotion requests were denied by Defendants and their management. Each time Plaintiff was denied, he was told directly and specifically by Defendants and their managers that they "could not" promote Plaintiff or that Plaintiff "did not deserve to be a Server" either because he "is not French" or "can't speak French."

98. Additionally, throughout Plaintiff's employment, Plaintiff observed numerous

employees who had less experience than Plaintiff, at Benoit or in the restaurant industry, be promoted to or hired as a Server, because they were either (i) French-born, or French-speaking and were light-complexioned, or (ii) were not French-born or French-speaking, but were light-complexioned. Upon Plaintiff's information and belief, many of the employees who were not French-born or French-speaking were light-complexioned and were of non-French European or Latin-American/Spanish descent. Despite the fact that these employees weren't French-born or French-speaking, they were still promoted by Defendants and their management, with less experience than Plaintiff, simply because they had lighter complexions than Plaintiff which matched the complexions of Defendant ALAIN DUCASSE and Benoit's management team and senior staff which were lighter than Plaintiff's. In all of Plaintiff's 16 years working for Defendants, Plaintiff never observed a non-French dark-complexioned individual be hired or promoted by Defendants to a Server.

99. Defendants' behavior, their setting of terms, conditions, and privileges of employment, and their methods of hiring and promoting throughout the relevant period were all clearly illegitimate, discriminatory and based entirely upon Plaintiff's race, color, and national origin, as shown not only by the reasons they verbally provided Plaintiff but as well as their actual practices of promoting and hiring. Plaintiff worked for Defendants for over 16 years and was never given a promotion by Defendants, despite his experience and knowledge with Benoit's offerings, operations, and clientele. Any other reasons Defendants may provide for their failure to promote Plaintiff as a defense to these claims are clearly pretextual.

100. Defendants' discriminatory conduct directly caused monetary and non-pecuniary damages to Plaintiff. Despite working hard for Defendants' over the course of over 16 years, Plaintiff was consistently told by Defendants that he would never be promoted solely due to his

race, color, and national origin. Despite being constantly denied promotions, Plaintiff continued to work hard for Defendants as a Busser, hoping his continuous hard work and pleading would eventually change Defendants' mind and they would finally give him a promotion to Server one day. However, each year, Defendants continued to exercise a discriminatory prejudice towards Plaintiff, which nullified all of Plaintiff's hard work as a Busser for Defendants over 16 years.

101. As a direct and proximate result of the discriminatory conduct and continuous discriminatory non-promotion Plaintiff was forced to endure throughout his employment with Defendants, Plaintiff suffered from loss of past and future earnings as well as numerous non-pecuniary losses, including: (1) mental anguish and distress, (2) pain and suffering, (3) physical discomfort, (4) anxiety, (5) humiliation, (6) embarrassment, (7) inconveniences, (8) shock, (9) outrage, and (10) egregious emotional distress and trauma.

**Plaintiff's Retaliation Claims**

102. Throughout Plaintiff's employment, Defendants and agents of Defendants retaliated against Plaintiff due to (i) his complaints regarding Defendants' labor law violations, and (ii) for discriminatory reasons regarding Plaintiff's race, color, and national origin, in violation of the FLSA, the NYLL, the NYSHRL and the NYCHRL.

103. As explained above herein, Defendants' subjected Plaintiff to an unlawful tip pool whereby numerous non-eligible employees were included and had tips misappropriated to them.

104. Throughout Plaintiff's employment, Plaintiff made numerous complaints to Defendants and their management regarding Defendants' improper tip pooling scheme.

105. Following each of Plaintiff's complaints, Defendants' would promptly retaliate against Plaintiff by either (i) reducing Plaintiff's schedule for following workweeks or (ii) cancelling Plaintiff's shifts for following workdays last-minute, thereby directly reducing

Plaintiff's earnings.

106. Following a complaint from Plaintiff, Defendants would either (i) call Plaintiff on the day of a scheduled shift and cancel Plaintiff's shift, sometimes last-minute and after Plaintiff was already ready to leave for work, or (ii) reduce Plaintiff's schedule by one to three workdays.

107. Throughout his employment, Plaintiff observed that light-complexioned employees who complained or raised concerns about Defendants' improper tip pooling were not retaliated against. Accordingly, Defendants' retaliatory conduct was also discriminatory in addition to their discriminatory conduct described above herein.

108. Every year throughout Plaintiff's employment, Plaintiff took manager-approved vacations towards the end of each year.

109. Throughout 2024, Plaintiff raised numerous complaints and concerns regarding Defendants' unlawful tip pooling scheme. At the end of 2024, in or around December 2024, Plaintiff requested his regular and customary vacation time, which Defendants and their management approved of. After receiving this approval, and solely due to this approval, Plaintiff took time off from work and went on his vacation. After Plaintiff's vacation ended, Plaintiff contacted Defendants' management to inform them he was back from vacation and wished to return to work. However, instead of putting Plaintiff back on their schedule, Plaintiff was told by Defendants "It says on the system that you quit in December, so you don't work here anymore."

110. Defendants' behavior and their termination of Plaintiff were clearly illegitimate, discriminatory, retaliatory, and based upon Plaintiff's (i) complaints and (ii) race, color, and national origin. Plaintiff worked for Defendants for over 16 years and always took a manager-approved vacation towards the end of each year, which became practically customary and habitual due to their timing and frequency. Any other reasons Defendants may provide for their

termination of Plaintiff's employment as a defense to these claims are clearly pretextual.

111. As a direct and proximate result of the continuous retaliatory conduct and retaliatory termination Plaintiff was forced to endure throughout his employment with Defendants, Plaintiff suffered from loss of past and future earnings as well as numerous non-pecuniary losses, including: (1) mental anguish and distress, (2) pain and suffering, (3) physical discomfort, (4) anxiety, (5) humiliation, (6) embarrassment, (7) inconveniences, (8) shock, (9) outrage, and (10) egregious emotional distress and trauma.

112. Plaintiff retained Lee Litigation Group, PLLC to represent Plaintiff, FLSA Collective Plaintiffs, and Class Members in this litigation, and has agreed to pay the firm a reasonable fee for its services.

## STATEMENT OF CLAIM

## COUNT I

## WAGE AND HOUR VIOLATIONS UNDER THE FAIR LABOR STANDARDS ACT

**(brought on behalf of Plaintiff and FLSA Collective Plaintiffs)**

113. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

114. At all relevant times, Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a). Further, Plaintiff and FLSA Collective Plaintiffs are covered individuals within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

115. At all relevant times, Defendants employed Plaintiff and FLSA Collective Plaintiffs within the meaning of the FLSA.

116. At all relevant times, each of the Corporate Defendants had gross annual revenues

in excess of $500,000.

117. At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs their wages, including overtime, due to time-shaving.

118. At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and tipped FLSA Collective Plaintiffs their proper wages, including overtime, due to a policy of deducting invalid tip credits from their wages for all hours worked.

119. At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and tipped FLSA Collective Plaintiffs their proper tips due to a policy of improper tip pooling and tip misappropriation.

120. At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs their proper wages, including overtime, due to two policies of timeshaving.

121. At all relevant times, Defendants had a policy and practice that failed to pay Plaintiff and FLSA Collective Plaintiffs their proper overtime premiums for all hours worked over 40 hours per workweek.

122. Records, if any, concerning the number of hours worked by Plaintiff and FLSA Collective Plaintiffs and the actual compensation paid to Plaintiff and FLSA Collective Plaintiffs should be in the possession and custody of the Defendants. Plaintiff intends to obtain these records by appropriate discovery proceedings to be taken promptly in this case and, if necessary, will then seek leave of Court to amend this Complaint to set forth the precise amount due.

123. Defendants knew of and/or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiff and FLSA Collective Plaintiffs their proper wages, including their proper wages and overtime premiums, when Defendants knew or

should have known such was due.

124. Defendants failed to properly disclose or apprise Plaintiff and FLSA Collective Plaintiffs of their rights under the FLSA.

125. As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff and FLSA Collective Plaintiffs are entitled to liquidated (i.e., double) damages pursuant to the FLSA.

126. Due to the intentional, willful, and unlawful acts of Defendants, Plaintiff suffered damages in an amount not presently ascertainable of (i) unpaid wages, (ii) unpaid overtime wages, (iii) unpaid tips, and (iv) liquidated damages for unpaid wages and tips.

127. Plaintiff and FLSA Collective Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs pursuant to 29 U.S.C. §216(b).

## COUNT II

## WAGE AND HOUR VIOLATIONS UNDER THE NEW YORK LABOR LAW

**(brought on behalf of Plaintiff and Class Members)**

128. Plaintiff realleges and incorporates all the above allegations of this Complaint as fully set forth herein.

129. At all relevant times, Plaintiff and Class Members were employed by the Defendants within the meaning of the New York Labor Law, §§ 2 and 651.

130. Defendants willfully violated Plaintiff's and Class Members' rights by subjecting them to two policies of timeshaving.

131. Defendants willfully violated Plaintiff's and Class Members' rights by failing to pay them any call-in pay premiums for all their instances of reporting to work for a scheduled shift for less than three (3) hours.

132. Defendants willfully violated Plaintiff's and Subclass Members' rights by failing to pay them their properly owed tips due to a policy of improper tip pooling and misappropriating their tips.

133. Defendants willfully violated Plaintiff's and Subclass members' rights by failing to pay them the lawful minimum wage for all hours worked. As factually described above, Defendants were not entitled to claim any tip credits from Plaintiff's and Subclass members' wages under the NYLL.

134. Defendants willfully violated Plaintiff's and Subclass members' rights by subjecting them to an improper policy and practice in which they were required to engage in non-tipped work for: (i) continuous periods of time exceeding 30 minutes; or (ii) more than 2 hours or 20% of each of their workweeks.

135. Defendants failed to properly notify Plaintiff and Class Members of their hourly pay rates and overtime rates, in direct violation of the New York Labor Law.

136. Defendants failed to provide Plaintiff and Class Members with proper wage and hour notices, at their dates of hiring and annually, per requirements of the New York Labor Law.

137. Defendants failed to provide Plaintiff and Class Members with proper wage statements with every payment as required by New York Labor Law § 195(3).

138. Due to the Defendants' New York Labor Law violations, Plaintiff and Class Members are entitled to recover from Defendants their (i) unpaid minimum wages, (ii) unpaid overtime wages, (iii) unpaid call-in pay premiums, (iv) unpaid tips, (v) liquidated damages for unpaid wages, tips, and premiums, (vi) statutory penalties for WTPA violations, and (vii) reasonable attorneys' fees and costs and disbursements of this action, pursuant to New York Labor Law.

## COUNT III

## DISCRIMINATION AND RETALIATION UNDER THE NEW YORK STATE HUMAN RIGHTS LAW

**(N.Y. Exec. Law § 292, *et seq*.)**
**(brought on Plaintiff's behalf only)**

139. Plaintiff realleges and incorporates all the above allegations as if fully set forth herein.

140. The New York State Executive Law § 296(1)(a) provides that:

> "1. It shall be an unlawful discriminatory practice:
>
> For an employer or licensing agency, because of an individual's [...] race, [...] color, national origin, […] to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

141. The New York State Executive Law § 296(7) provides that:

> "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint"

142. As factually described above, Defendants violated Plaintiff's statutorily protected rights under the New York State Human Rights Law by engaging in (i) discriminatory employment practices and denying promotions to Plaintiff based on Plaintiff's race, color, and national origin, and (ii) retaliatory conduct (including schedule reduction and termination) against Plaintiff.

143. This discriminatory and retaliatory conduct was intentional, malicious, and willful, and performed in reckless disregard of Plaintiff's protected rights under the NYSHRL.

144. As a direct and proximate result of Defendants' willful disregard of the NYSHRL, Plaintiff suffered damages in the form of loss of past and future earnings, numerous past and future non-pecuniary losses, and the costs of bringing this action. Plaintiff seeks all applicable

remedies under the law, including (1) an injunction ordering Defendants to cease their discriminatory practices as described herein, (2) compensatory damages, (3) punitive and egregious emotional distress damages, and (4) attorneys' fees and costs.

## COUNT IV

## DISCRIMINATION AND RETALIATION UNDER THE NEW YORK CITY HUMAN RIGHTS LAW

**(N.Y.C. Admin. Code § 8-101, *et seq.*)**
**(brought on Plaintiff's behalf only)**

145. Plaintiff realleges and incorporates all the above allegations as if fully set forth herein.

146. The New York City Administrative Code §8-107(1)(a) provides that:

> "1. It shall be an unlawful discriminatory practice:
>
> For an employer or an employee or agent thereof, because of the actual or perceived [...] race, […] color, national origin […] of any person:
>
> > (1) To represent that any employment or position is not available when in fact it is available;
> >
> > (2) To refuse to hire or employ or to bar or to discharge from employment such person; or
> >
> > (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment."

147. The New York City Administrative Code §8-107(7) provides that:

> "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint"

148. As factually described above, Defendants violated Plaintiff's statutorily protected rights under the New York City Human Rights Law by engaging in (i) discriminatory employment practices and denying promotions to Plaintiff to based on Plaintiff's race, color, and

national origin, and (ii) retaliatory conduct (including schedule reduction and termination) against Plaintiff.

149. This discriminatory and retaliatory conduct was intentional, malicious, willful, and performed in reckless disregard of Plaintiff's protected rights under the NYCHRL.

150. As a direct and proximate result of Defendants' willful disregard of the NYCHRL, Plaintiff suffered damages in the form of loss of past and future earnings, numerous past and future non-pecuniary losses, and the costs of bringing this action. Plaintiff seeks all applicable remedies under the law, including (1) an injunction ordering Defendants to cease their discriminatory practices as described herein, (2) compensatory damages, (3) punitive and egregious emotional distress damages, and (4) attorneys' fees and costs.

## COUNT V

## RETALIATION UNDER THE FAIR LABOR STANDARDS ACT

**(brought on Plaintiff's behalf only)**

151. Plaintiff realleges and incorporates all the above allegations as if fully set forth herein.

152. At all relevant times Plaintiff was an employee of Defendants within the meaning of the FLSA, and was a person covered by and intended to benefit from the provisions of the FLSA.

153. Section 15(a)(3) of the FLSA provides that it is a violation for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint . . . under or related to this Act."

154. As alleged herein, Plaintiff complained to Defendants and Defendants' managers regarding Defendants' wage violations.

155. In response to such complaints, Defendants reduced Plaintiff's schedule numerous times and eventually terminated Plaintiff's employment, in violation of Section 15(a)(3).

156. This retaliatory conduct and termination was intentional, malicious, willful, and performed in reckless disregard of Plaintiff's protected rights under the FLSA.

157. As a direct and proximate result of Defendants' willful disregard of the FLSA, Plaintiff suffered damages in the form of loss of past and future earnings, numerous past and future non-pecuniary losses, and the costs of bringing this action. Plaintiff seeks all applicable remedies under the law, including (1) an injunction ordering Defendants to cease their discriminatory practices as described herein, (2) compensatory damages, (3) punitive and egregious emotional distress damages, and (4) attorneys' fees and costs.

## COUNT VI

## RETALIATION UNDER THE NEW YORK LABOR LAW

**(brought on Plaintiff's behalf only)**

158. Plaintiff realleges and incorporates all the above allegations as if fully set forth herein.

159. At all relevant times Plaintiff was an employee of Defendants within the meaning of the NYLL, and was a person covered by and intended to benefit from the provisions of the FLSA.

160. Defendants' actions constitute a violation of Sections 215 of the NYLL. In relevant part, NYLL § 215(1)(a) states:

> "No employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer, or to the commissioner or his or her authorized representative, or to the attorney

general or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter, or any order issued by the commissioner" (emphasis added).

161. As alleged herein, Plaintiff complained to Defendants and Defendants' managers regarding Defendants' wage violations.

162. In response to such complaints, Defendants reduced Plaintiff's schedule numerous times and eventually terminated Plaintiff's employment, in violation of Section 215(a).

163. This retaliatory conduct and termination was intentional, malicious, willful, and performed in reckless disregard of Plaintiff's protected rights under the NYLL.

164. As a direct and proximate result of Defendants' willful disregard of the NYLL, Plaintiff suffered damages in the form of loss of past and future earnings, numerous past and future non-pecuniary losses, and the costs of bringing this action. Plaintiff seeks all applicable remedies under the law, including (1) an injunction ordering Defendants to cease their discriminatory practices as described herein, (2) compensatory damages, (3) punitive and egregious emotional distress damages, and (4) attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself, FLSA Collective Plaintiffs, and Class Members, respectfully requests that this Court grant the following relief:

a. A declaratory judgment that the practices complained of herein are unlawful under the FLSA, the NYLL, the NYSHRL, and the NYCHRL;

b. An injunction against Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

c. An award of unpaid wages and overtime as a result of Defendants' invalid tip credit deductions, due under the FLSA and the NYLL;

d. An award of unpaid wages and overtime as a result of Defendants' policies of timeshaving, due under the FLSA and the NYLL;

e. An award of unpaid tips as a result of Defendants' misappropriation of tips, due under the FLSA and the NYLL;

f. An award of unpaid call-in pay premiums, due under the NYLL;

g. An award of statutory penalties as a result of Defendants' failure to comply with the New York Labor Law's wage notice and wage statement requirements;

h. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to 29 U.S.C. § 216;

i. An award of liquidated and/or punitive damages as a result of Defendants' willful failure to pay wages pursuant to the NYLL;

j. An award of compensatory damages, punitive damages, and damages for egregious emotional distress as a result of Defendants' discriminatory conduct, due under the NYSHRL and the NYCHRL;

k. An award of compensatory damages, punitive damages, and damages for egregious emotional distress as a result of Defendants' retaliatory conduct, due under the NYSHRL and the NYCHRL;

l. An award of compensatory damages, punitive damages, and damages for egregious emotional distress as a result of Defendants' retaliatory conduct, due under the FLSA and the NYLL;

m. An award of pre-judgment and post-judgment interests, costs, and expenses of this

action together with reasonable attorneys' and experts' fees and statutory penalties;

n. Designation of Plaintiff as Representative of the FLSA Collective Plaintiffs;

o. Designation of this action as a class action pursuant to F.R.C.P. 23;

p. Designation of Plaintiff as Representative of Class; and

q. Such other and further relief as this Court deems just and proper.

**<u>JURY DEMAND</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable as of right by jury.

Dated: February 20, 2026
New York, New York

Respectfully submitted,

**LEE LITIGATION GROUP, PLLC**
C.K. Lee (CL 4086)
Anne Seelig (AS 3976)
148 West 24th Street, 8th Floor
New York, NY 10011
Tel.: 212-465-1188
Fax: 212-465-1181

*Attorneys for Plaintiff,*
*FLSA Collective Plaintiffs,*
*and the Class*

By: <u>/s/ *C.K. Lee*</u>
C.K. Lee, Esq.